IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
OCTOBER 22, 2008 Session

**TAMMY RENEE ADAMS v. JEFFERY FARRELL ADAMS**

**Direct Appeal from the Chancery Court for Gibson County**
**No. 17193      George R. Ellis, Chancellor**

---

**No. W2008-00225-COA-R3-CV - Filed March 17, 2009**

---

This appeal involves a father's petition to modify a parenting plan due to an alleged material change in circumstances. The trial court found that a material change in circumstances had occurred, and that it was in the children's best interest for the father to be named primary residential parent. The trial court awarded the father his attorney's fees. Mother appeals. We affirm and remand for further proceedings.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER,J., and HOLLY M. KIRBY, J., joined.

Betty Stafford Scott, Jackson, TN, for Appellant

Michael A. Carter, Milan, TN, for Appellee

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

Jeffrey Adams ("Father") and Tammy Adams ("Mother") married in 1990. Their daughter Madison was born in 1996, and their son Connor was born in 2000. The parties were divorced on November 22, 2004, and the agreed-upon parenting plan named Mother primary residential parent. The parenting plan prohibited both parties from exposing the children to alcohol or drugs, and it prohibited them from having any paramour spend the night in the presence of the children.

On August 30, 2006, Father filed a "Verified Motion for Temporary Restraining Order, for Contempt, to Modify Permanent Parenting Plan and for Psychological Custodial Evaluation." In his motion, Father alleged that Mother had engaged in inappropriate behavior and failed to properly care for the children. Specifically, Father alleged that on August 19, 2006, Mother, who was 36 years old, had a party at her house while the children, ages ten and five, were present. Father claimed that underage drinking and "dirty dancing" took place, in the presence of the children, until the early hours of the morning. Father further alleged that Mother was romantically involved with a teenager and allowing him to stay at her house while the children were present, and he claimed that Mother had sent text messages containing adult subject matter to a minor. Father also claimed that Mother had left Connor alone at her house, and the child called 911. Father alleged that Mother was terminated from her job as a school nurse on August 28, 2006, and failed to take Connor to school the next day. Father also claimed that Mother had accessed Father's credit card records and telephone records via the Internet without permission. In sum, Father contended that Mother's unusual and irresponsible behavior constituted a material change in circumstances and that it was in the children's best interest that he be designated primary residential parent. Father noted that he had recently remarried, and he claimed that he and his new wife Jenifer ("Mrs. Adams") could provide a stable environment for the children.

The trial court entered a temporary restraining order prohibiting Mother from removing the children from Father's care. Mother was granted visitation with the children every other weekend and on designated holidays, but it was to be supervised by Mother's mother or another responsible adult agreed upon by Father.

Mother filed an answer and counter-petition for contempt, in which she sought the immediate return of the children. She admitted that she had a "small gathering or what one might describe as a party" at her house, but she denied that alcohol was "openly consumed" by people who were underage. She also denied that any sexually inappropriate conduct occurred. Mother denied being romantically involved with a teenager but admitted having nineteen and twenty-year-old friends. Mother further denied that she was terminated from her job on August 28, and she claimed that she did not take Connor to school the next day due to his allergies. She admitted leaving Connor at home alone on one occasion and that he called 911, but she claimed she left him alone "at his request" and was only gone fifteen minutes. She also admitted accessing Father's credit card and telephone records online. Mother alleged that her difficulties with Father had arisen since he remarried. She claimed that Father and his family made degrading comments about Mother in the presence of the children. She also alleged that Father and Mrs. Adams lived together for three

months prior to their marriage, and that Mrs. Adams was present overnight during the children's visitation with Father during that time. The parties consented to psychological custodial evaluations of Mother, Father, Mrs. Adams, and the two children.

On or around October 22, 2006, an altercation occurred between Mother and her parents during supervised visitation at Mother's parents' house. Mother obtained an order of protection against her father on or about November 14, 2006, and thereafter, Mother's mother and sister refused to supervise Mother's visitation. As a result, Mother only had telephone contact with the children for several weeks. In the meantime, Dr. Robert Kennon, a licensed psychologist, began interviewing the parties for their custodial evaluations. He wrote a letter to the court encouraging the appointment of another person to supervise visitation. Dr. Kennon acknowledged Father's concerns regarding the children's safety and recommended that Mother's visitation continue to be supervised. However, Dr. Kennon expressed concerns that the children would be confused and experience separation anxiety if they had no visitation with Mother. On or around December 2, 2006, a consent order was entered allowing Mother's cousin to supervise visitation. Following a hearing on April 25, 2007, Father agreed that Mother should be granted unsupervised visitation.

Approximately twenty-three witnesses testified over the course of a four-day trial. Madison was eleven years old at the time, and Connor turned seven years old during the proceedings. Dr. Kennon testified as to the results of the psychological custodial evaluations he performed and also submitted a thirty-three page report containing his findings. Dr. Kennon had conducted psychological testing and interviews of Mother, Father, Mrs. Adams, and the children, and he also interviewed Mother's mother and sister. Although Mother's mother and sister reported many concerns about Mother's behavior, Dr. Kennon found that his interview with them "revealed their love for [Mother]," and Dr. Kennon noted that he did not perceive any attempt by Mother's mother or sister to undermine Mother's authority.

Both Mother and Father reported drinking occasionally, but Dr. Kennon found that neither parent exhibited signs of alcohol or drug dependence. He also found that neither parent showed signs of psychopathology, although both parents had personality issues. Dr. Kennon found that Father had "a history of admitted passivity" in his relationships with the children and others. Dr. Kennon testified that "the greatest weakness [he] found" with Father, and "one of his only weaknesses," was that Father avoids interacting with Mother, leaving the responsibility to Mrs. Adams. He also found that Father's attitude toward Mother was negative and borderline judgmental. Father admitted that he was hesitant to discipline the children because he felt sorry for them. Dr. Kennon testified that he thought Father acted appropriately in filing the petition to modify due to the problems that Mother was having.

Dr. Kennon found that Mother had demonstrated "erratic changes in her behaviors," including her admitted involvement with a married man, her impulsive decision to have a party with teenage males at her home, and her recent conflicts with her own family members. He found that Mother's actions suggested "problematic modeling of appropriate relational boundaries for her children." Dr. Kennon also found that Mother had attempted to manipulate the children and noted

that "[t]hese types of actions can be emotionally abusive." Dr. Kennon found that Mother "communicates excessive amounts of information to Madison" about Mother's conflict with Father and the custody case. Dr. Kennon stated that Madison was aware of "details which were not appropriate to Madison's age and developmental conflict," which could lead to anxiety and depressive symptomatology as a result of being overburdened with adult responsibilities. Dr. Kennon also found that Mother fosters a degree of dependency with Conner so that he had become highly emotionally dependent on her. Dr. Kennon noted that Mother slept with Conner on a nightly basis and reported, "This is inappropriate for his age and should be modified immediately." Dr. Kennon found that Mother tends to rationalize behaviors and blame her problems on other individuals. He found that the majority of the conflict between Mother and Mrs. Adams was due to Mother and her unjustified anger and animosity toward Mrs. Adams.

Dr. Kennon found that Mrs. Adams was "the most realistic of the three adults evaluated." He explained that Mrs. Adams understood the children's need to visit with Mother, while displaying appropriate concern regarding Mother's erratic behavior.

Dr. Kennon administered a test to both children called "the Bricklin Perceptual Scales," which he described as a test to determine how children perceive their parents. He explained that "when this test was being studied, it agreed with the Court's findings 97% of the time. So, it has a pretty high reliability factor with what the Court ends up awarding in the end." Both Madison and Conner's test results indicated that Mother was their parent of choice. Despite the children's stated preference to live with Mother, Dr. Kennon testified that children do not always know what is best for them.

Although Dr. Kennon did not specifically recommend that either parent be named the primary residential parent, he testified that Father was "quite capable" of being the primary residential parent. Dr. Kennon stated that there was nothing to indicate, from a clinical standpoint, that Mother would be unfit to be named primary residential parent. However, he said she had demonstrated negative, erratic behavioral changes since the divorce. Dr. Kennon stated that Mother had "characterlogical issues," boundary issues, unresolved anger toward Father, and unjustified anger and animosity toward Mrs. Adams. Dr. Kennon recommended that Mother undergo insight oriented counseling and treatment, stating that she was in need of "improved awareness of her inappropriate behavior." As for Father, Dr. Kennon recommended "brief counseling and increased understanding of the passive role he maintains with [Mother]."

At trial, Mother's mother, Mrs. Patty Stafford, testified that she had heard Mother threaten to harm Father, Mrs. Adams, and Father's parents many times, and she considered the threats to be serious. For example, regarding Mrs. Adams, Mother had stated that she would find her and "get her," she just didn't know when or where. Mother had also allegedly told Connor, on several occasions, to vomit in Mrs. Adams's face. Mrs. Stafford testified that Mother told her that "as soon as this is over and she got her hands on the children, that she'd be gone and nobody would see them again." Mrs. Stafford testified that she did not approve of Mother's most recent boyfriend, Edward

-4-

Reams, because he was married. Mother had recently moved from Bradford to Martin, Tennessee, and Mother allegedly told Mrs. Stafford that Mr. Reams was renting a place for her there.

Mrs. Stafford testified that many times, Mother appeared to be "out of it" and unresponsive, and she became worried that Mother was using drugs or alcohol. Mrs. Stafford said Mother told her that she was taking nerve pills to make her "not care" and also sleeping pills. Mrs. Stafford recalled one occasion in February of 2006 when she and her family went to Mother's house for Madison's birthday party, and Mother was "very, very out of it" and sleeping, so that she hardly knew they were there. Mrs. Stafford testified that on Mother's Day of 2006, Mother sat on the couch for several hours sleeping with her head "dangling" while everyone else played outside with the children. She said the children would go and try to wake Mother, but she wouldn't respond. Mrs. Stafford testified that late one night, Mr. Reams called her and said he feared that Mother had overdosed because he had been unable to contact Mother for several hours. He asked Mr. and Mrs. Stafford to go to Mother's house and check on her, stating that he was unable to do so because he was at home with his family. Mrs. Stafford recalled another night when Mother was supposed to come see the children, but she did not arrive until 1:30 or 2:00 a.m. Mrs. Stafford testified that when Mother finally arrived, the children's babysitter, who was sixteen years old at the time of trial, was driving, and Mother and Mr. Reams were in the back seat. Mrs. Stafford said that when Mother got out of the car, she could hardly stand up, she was giggling, and "very much under the influence."

Mrs. Stafford testified about the difficulties she encountered when supervising Mother's visitation at her home. She said Mother was always at least forty-five minutes late. According to Mrs. Stafford, when Mother did arrive, she would lie on the couch or talk on her cell phone. Mrs. Stafford testified that on one occasion, Mother brought Mr. Reams with her to Mrs. Stafford's home for supervised visitation, and Mother's father asked Mr. Reams to leave. Mother reportedly became very upset and said she would never be back. Mrs. Stafford testified about another occasion when she asked Mother not to bring her dog with her to visitation because it had fleas, and Mother became very upset. The next morning, Mrs. Stafford found Mother and the children sleeping outside in the car. Mrs. Stafford testified that when it was time for her to take the children back to Father's house, Mother would intentionally make them late by going out on the four-wheeler with the kids and refusing to come back. Mrs. Stafford said Mother would "drill" the children on how to show that they wanted to live with Mother. Mrs. Stafford said Mother would tell the children to misspell their spelling words and make bad grades, and she told them to go to the school counselor and say they wanted their mother. Mother also allegedly showed disguises to the children and told them to look for her walking around the school.

Mrs. Stafford briefly described the altercation with Mother which led to the order of protection.[1] She said Mother woke the children at around 2:30 a.m., then started acting "very ugly" to her and Mr. Stafford and screaming and cursing at them. She said Mother attacked her, and Mr.

---

[1] Mother had reported to Dr. Kennon that on the night of the altercation at her parents' house, she was frustrated and began "packing up her stuff." It appears that Mother intended to leave the house with the children.

Stafford pulled Mother off of her. She said Mr. Stafford also put his hand over Mother's mouth to stop her from screaming and cursing.

Mrs. Stafford concluded by stating her opinion that Mother had not provided a stable, structured, consistent environment for the children since the divorce. Mrs. Stafford stated that she had noticed a positive change in the children since they had been living with Father, and she thought Father was doing "a fine job" with the children.

Mother's Father, Mr. Harrell Stafford, also testified that he began noticing changes in Mother's behavior soon after the divorce. He testified about Mother being slumped over on the couch for hours at a time, and he said on one occasion, he found a water bottle full of alcohol where Mother had been lying on the couch. Mr. Stafford also testified that in September of 2006, Mr. Reams called and said he was concerned that Mother may have overdosed. Mr. Stafford said he and his wife immediately went to Mother's home and let themselves in, where they found Mother on the couch "out of it." He said he went back to Mother's house the next morning to check on her again, and Mother acted as if she did not remember them being there the night before. Mr. Stafford testified that Mother's house was generally "a disaster" and scattered with dog feces. Mr. Stafford also testified that he had heard Mother state that she could take the children and go somewhere where she could not be found. Mr. Stafford said he had no problems with Father relating to custody or visitation.

Mr. Stafford testified that Mother was never on time for supervised visitation, and he said on some days, she did not show up at all. Mr. Stafford said when Mother was there, she would talk on her cell phone to her boyfriend. He testified about asking Mr. Reams to leave when Mother brought him with her. Mr. Stafford testified that on the night of the altercation with Mother, he had already gone to bed, and Mrs. Stafford came and woke him up, stating that she feared Mother was going to try to leave with the children. Mrs. Stafford told him that Mother had been loading things into her car and she had gone to wake up the children. Mr. Stafford explained that he and his wife went into the bedroom where Mother was waking the children, and Mrs. Stafford told Mother to go to bed. He said Mother became irrational and "just went off" disrespecting Mrs. Stafford with bad language. Mr. Stafford said he told Mother "that she wasn't going to disrespect her mother in our house," and when Mother continued, he put his hand on her jaw and escorted her out of the house.

Mother's sister, Tonya Stafford, who had also supervised visitation for Mother, testified as well. She could not recall a single occasion when Mother arrived to visitation on time. She said when visitation was scheduled for a weekend, Mother might stop by sometime during the course of the day on Saturday, but she did not take advantage of her time with the children. She said she had heard Mother tell Madison that if she would "throw a big enough fit," she could get what she wanted from Father. Ms. Stafford said Mother had told Connor that he should do poorly in school so that it would look like he was not happy and wanted to be with Mother. She also told him to "go crying to Miss Beverly," the school counselor, and say that he missed Mother. Ms. Stafford had also heard Mother tell Connor to vomit in Mrs. Adams's face. Mother had told Ms. Stafford, regarding Mrs. Adams, "It may take me a while to figure out how to do it so nobody can pin it on me, but I'll kill

that bitch." Mother had also allegedly told Ms. Stafford that she could take the children and go somewhere where no one would ever see them again. Ms. Stafford testified that the children had made positive improvements since living with Father.

Leslie McEwen Hicks, Mother's cousin who subsequently supervised visitation, testified that Mother was very active during the visits she supervised. Ms. Hicks said she thought both Mother and Father were good parents.

Mother's aunt, Jeanine Howard, who is Mrs. Stafford's sister, also testified. She said she had no doubt that Mother's mother, father, and sister would lie about Mother because of hard feelings that existed over other family issues. Ms. Howard also said that if any other witnesses testified that Mother had threatened Father or Mrs. Adams, then those witnesses were lying too. Ms. Howard acknowledged, though, that she does not see Mother very often because she lives across the state. Ms. Howard said she comes to visit West Tennessee "sporadically," on holidays and special occasions.

A sixteen-year-old boy named Jeremy testified that he knew Mother from mowing her yard and his previous visits to Mother's house to see her babysitter, who was his girlfriend at the time. He said Mother had shown him pictures on her cell phone of her nude breasts. He also said one night when he was at Mother's house and Mother was drinking, she pulled up her shirt and exposed her breasts to him while wearing a see-through bra.

Laina Street testified that she previously worked at the school where Mother worked as the school nurse, and she considered herself a friend to Mother. She testified that once when she was in the teacher's lounge with Mother at school, Mother showed her a picture of herself, nude from the waist up, on her cell phone. Ms. Street also said Mother had told her about stripping at a club on amateur night, and Mother said it was addictive because she got a lot of money. Ms. Street said she had seen a pornographic DVD case, with naked people on the cover, lying out in the open at Mother's house when children were present.

Sharon Hooker testified that she also worked with Mother at the school. She said Mother showed her and other employees at the school an inappropriate picture of herself, naked from the waist up, on her cell phone. Ms. Hooker also testified that Mother had told her that "all she had to do was say the word," and she could have Father killed or beaten up because her new boyfriend was in Hell's Angels. Ms. Hooker testified that she cleaned Mother's house a few times after Mother's divorce, and she described the house as being in bad condition. She said Mother and the two kids apparently slept in the same bed with their two dogs and two cats. Ms. Hooker said there was cat litter in the beds, dog feces on the floors, and once, there was human feces in the children's shower. Ms. Hooker said that she quit cleaning Mother's house because she would have bites or welts on her face and hands after being in Mother's house.

Beverly Summers, the school's guidance counselor, testified about an experience she had with Mother. She testified that after the temporary restraining order was entered against Mother

requiring supervised visitation, the school's attorney advised the staff that Mother could not visit the children at school unless she had an approved adult with her. Ms. Summers said Mother arrived at school one day unattended and went to the lunchroom to see Madison. Ms. Summers approached Mother and told her that it was the staff's understanding that Mother could not be visiting the children at school without an approved adult. Ms. Summers said she asked Mother to please not make a scene at the school, but Mother responded with a defiant attitude and simply said, "I'm going back in there." Mother went back in to where the children were, and Ms. Summers stayed to observe until Mother left. On another day, Mother arrived at the school with her mother, Mrs. Stafford, but then went out into the hallway with Madison alone and without supervision. Ms. Summers again followed Mother to supervise.

The Superintendent of the Bradford Special School District, Bobby Joe McCartney, also testified at trial. He said that Mother had worked as the school nurse for five years, but she "had to resign" in August of 2006. He said during the previous school year, he received several complaints about Mother having pornography on her cell phone. However, he did not take action because it was near the end of the school year. At the beginning of the current school year, Mr. McCartney informed all the employees that if anyone was reported for having pornography on their cell phone, they would be immediately dismissed. Still, a few days later, it was again reported that Mother had pornography on her cell phone.[2] Mr. McCartney said he had also received complaints from the principal that many of the high school students were spending too much time at the nurse's station. Mr. McCartney said that based on these complaints, he met with Mother and "told her at that time, if she would resign, I would let her resign, because I always do that." However, if Mother refused to resign, she would have been terminated.

Karen Harrison, a physician's assistant who regularly treated the children at the local clinic, testified by deposition. She said that in December of 2005, Mother brought Connor in with an ear infection and reported that she had given him an injection of a specific antibiotic the previous night. Ms. Harrison told Mother that the antibiotic she had given Connor was not appropriate for treating an ear infection, and its side effects could lead to hearing loss. Ms. Harrison also noted that, to her knowledge, no one had prescribed that antibiotic for Connor. She also stated that it was not appropriate for Mother to inject any type of antibiotic at home, outside of a clinical setting. On another occasion, Madison was brought into the clinic by her grandmother for an ingrown toenail. Madison's grandmother had a bag of medications that Mother had instructed her to give to Madison. Ms. Harrison testified that she had never prescribed at least one of the medications in the bag for Madison, as it was not approved for use in pediatric patients. She stated that the drug was indicated for the treatment of pneumonia and sinusitis in adults.

Mother's babysitter, Harmony, was sixteen years old at the time of trial. She testified that she attended school where Mother worked as a nurse, but she had been babysitting for Mother for about three years and thought of mother like a sister. Harmony testified that she invited one friend

---

[2] We note that Mrs. Adams and Father's mother also worked at the same school where Mother worked. However, Mr. McCartney stated that the complaints did not come from either of them.

to Mother's house on the night of the party on August 19, 2006. However, Harmony said she had to leave Mother's house after about thirty minutes because her mother made her come home. Harmony testified that she had never seen alcohol, drugs, or pornography at Mother's house.

A young man named Wade Mathis testified that he was at the party at Mother's house the previous summer. Mr. Mathis was twenty years old at the time of trial. He said he arrived with his friend Jamie after midnight, and there were people there who were drinking alcohol underage. He said Madison and Connor were awake and running around the house in the presence of the people drinking. Mr. Mathis said there were six to seven males present, but Mother and Madison were the only females. He said he saw "dirty dancing" that involved "touching on each other." Mr. Mathis said people were coming and going, and he left after about fifteen minutes.

Justin Tanner testified that he was also at the party at Mother's house. He was twenty years old at the time of trial, but nineteen at the time of the party. Mr. Tanner testified that Mother's babysitter called him and invited him to the party, and he said that he stayed at Mother's house from 11:00 p.m. to 5:00 a.m. He said the babysitter was there when he arrived, and other male guests came and went throughout the night. Mr. Tanner said he observed underage drinking in the presence of the children, and some of the people at the party were under the age of eighteen. He acknowledged that he was drinking underage and said Mother bought the alcohol for him. He also said he observed "the kind of dancing you'd probably see in a club." Mr. Tanner testified that he began a sexual relationship with Mother on the night of the party, and that he went over to Mother's house several more times in the next few weeks to have sex. He said sometimes the children were present when he would go to Mother's house to have sex. Mr. Tanner testified that Mother sometimes appeared to be incoherent or "out of it," and she admitted to "taking pills." Mr. Tanner testified that prior to his deposition, Mother asked him to lie for her and "make the story sound clean on her side."

Brian Hutson, who was nineteen at the time of trial, testified that he was at the party at Mother's house, and he knew Mother from her job as the school nurse. He acknowledged seeing two people drinking underage at Mother's house. He said he saw dancing, but it was not sexual in nature. Mr. Hutson said Mother and Madison were dancing together, and he and another gentleman were dancing at the same time. Mr. Hutson was not aware of any sexual relationship between Mother and Justin Tanner, and Mr. Hutson said he was the last one to leave at around 4:30 or 5:00 a.m. Mr. Hutson said he was invited to Mother's house on another occasion, by Justin Tanner, to shoot fireworks.

Dwayne Reynolds, who is a sheriff's deputy, testified that he was at Mother's party. He said that he did not see anyone drinking, but he could not be sure that no one was drinking that night. He said he was "in and out of the house a lot" because he was talking to people outside. He also said Connor was playing outside. Mr. Reynolds first said the dancing he observed was not inappropriate, but then he explained that it was inappropriate in the presence of children. Mr. Reynolds said he did not observe anything sexual occurring between Mother and Justin Tanner, "other than the dancing," but Mr. Tanner was still there when he left.

Chris Johnstone, who is a state trooper, testified that he was also at Mother's party. He said he saw Justin Tanner drinking alcohol, and he saw the type of dancing that you would see at a nightclub. He said the children were awake, playing and watching television.

Father's current wife, Mrs. Adams, testified about an altercation she had with Mother on Christmas Day of 2005, when Mother was seven hours late picking up the children for her visitation. She said they discussed an insulting card Mother had sent to her, then Mother started insulting Mrs. Adams's other children. The argument escalated, and according to Mrs. Adams, Mother "took a swing" at her, so she hit Mother. This was witnessed by the children. Mrs. Adams also testified about insulting wedding gifts Mother sent to her through the children, such as an apron with a picture of the "wicked stepmother" from Snow White, which read, "Queen's Poisons – Call 555-IMA-WITCH." Mrs. Adams testified that Madison brought a cell phone from Mother's house that had several pictures on it of someone's bare bottom, and another picture of Mother's cleavage.

Father testified that he and Mrs. Adams live in a newly constructed house with her three children from a previous marriage, and Madison and Connor, and each child has their own bedroom. Father explained that Mrs. Adams gets the children ready for school in the mornings because he is already at work, and Mrs. Adams then takes the children to school because she teaches where the children attend school. Father said he gets home from work at around 3:00 p.m. and is home when Mrs. Adams and the children get home from school. He testified that his parents live next door to him, but the children regularly visit both sets of their grandparents – both Mother's parents and his parents.

Father acknowledged that he moved in with Mrs. Adams for a short time before they were married, but he explained that his house was destroyed by a tornado, he was already engaged to Mrs. Adams, and he had nowhere else to go. Father stated his opinion that Mother was not providing a stable environment for the children. He testified that he tries to foster a good relationship between the children and Mother, but he said it was difficult because "she likes to agitate." Father testified that he had been going to counseling, and he said that if he was designated primary residential parent, he would do everything he could to facilitate a good relationship between the children and Mother.

Mr. Reams testified that he was currently in the process of a divorce, but he acknowledged dating Mother from approximately March of 2005 through November of 2006. He testified that he never saw Mother under the influence of any substance, and he denied that he was ever concerned about her overdosing. Mr. Reams said he had been to Mother's house "a time or two" since they broke up, but not in the past three months.

Mother testified that she was thirty-seven years old at the time of trial. Mother claimed that Mother's mother, father, and sister all lied in their testimony. Mother denied making any threats against Father or Mrs. Adams. She admitted being late to supervised visitation but said she was not consistently late. She claimed that she only slept on the couch during supervised visitation at her parents' house on one occasion when she was tired from working. Mother said she dropped the order of protection against her father and sent her family a letter, but they had not contacted her.

Mother denied ever taking illegal drugs, and she introduced the negative results of a hair follicle drug test she had taken just prior to the first day of trial in May of 2007. She admitted to taking anti-anxiety medication when she needed it. Mother admitted giving Connor antibiotics that were not prescribed for him, but she said she didn't recall giving him antibiotics by injection. When asked about Ms. Harrison's testimony to the contrary, Mother said she did not think Ms. Harrison "lied intentionally, but things get mixed up." Mother testified that her 2007 nursing drug handbook indicated that the drug she gave to Madison was appropriate to give to children weighing over 88 pounds. She admitted, though, that the drug had not been prescribed for Madison.

Mother denied ever taking pictures of her breasts on her cell phone. She said the sixteen-year-old who testified that Mother exposed her breasts to him and showed him nude pictures simply lied. Mother also insisted that she was not asked to resign from her job as a school nurse, and she said the school superintended who testified to the contrary "apparently lied." Mother said Ms. Hooker lied in her testimony as well, but she did not specify what she lied about. Mother said her former co-worker, Ms. Street, lied when she said Mother had stripped at a club on amateur night.

Regarding the party at her house in August 2006, Mother testified that she did not invite the people who were there. She said there was no alcohol in her house, and there was no dirty dancing. Mother said she danced with Madison. She also said that the children were "where I could see them pretty much the whole time." Mother said the party was "a mistake and it was not intentional." Mother denied that she ever had a sexual relationship with Justin Tanner and said he lied during his testimony. Mother also said Wade Mathis lied during his testimony. When asked whether Chris Johnstone, the state trooper, also lied about the party, Mother said, "I'm not saying he lied. I'm saying that I may not have seen everything he saw."

Mother admitted that she accessed Father's credit card and telephone records online without his permission, but she said she quit after being contacted by Father's attorney. As for the altercation with Mrs. Adams, Mother said she was simply talking to Father in his driveway when Mrs. Adams came outside cursing at her and attempted to hit her. Mother said she just drove away. Mother admitted leaving Connor at home alone on one occasion. She said Connor begged to stay home by himself while she went to run an errand. Mother said she was only gone ten minutes, and when she returned, the sheriff was there because Connor became afraid and called 911.

Mother stated that she had recently moved to Martin because she could no longer function to the best of her ability in Bradford. She said she moved to Martin for its job opportunities and school system. She testified that she had recently accepted a position as an administrative nursing director at a group home. Mother said it was an error in judgment for her to date Mr. Reams when he was still married, but she claimed that she had not been in his presence in the past three months.

Mother testified that she thought Father only filed the petition to modify so that he could avoid paying child support. She acknowledged, however, that Father had not asked her to pay any child support in the year since he had been granted temporary custody, and in fact, Father had continued to pay child support to her for approximately four months when he had custody of the

children, and Mother kept the money. Mother said she thought it was in the children's best interest to move with her to Martin because the children were happier living with her. Mother testified that she had seen Father push the children and hold Madison upside down while shaking her violently. Mother admitted that she still sleeps with both of her children, despite Dr. Kennon's recommendation, because their time together is so precious.

Ms. Hooker, who previously worked at the school with Mother and cleaned her house, was called to testify again as a rebuttal witness. She testified that she saw Mother in her car with Mr. Reams when sitting at a red light in Martin just one month earlier, on June 22, 2007. She said she followed them and saw them pull in the garage at Mother's house.

The trial judge allowed Madison to testify "at the insistence of Mother." Madison was eleven years old at the time. Madison testified that she loved both her parents very much. She said that she likes living with Mother and would not mind changing schools. She said she currently makes A's and B's and was on the "B Honor Roll." Madison testified that Father had held her upside down and shook her one time when her parents were still married after she got gum in Father's hair.

Madison testified that on the night of the party at Mother's house, she saw two boys drinking beer, and she danced with Mother. Madison also testified about the altercation between Mother and Mr. and Mrs. Stafford during supervised visitation. She stated that Mother "was going to take us to the trailer to sleep," and Mr. Stafford came in and pushed Mother down the hall. She described the trailer as her "grandma's old trailer right across the gravel."

At the conclusion of the proof, the trial judge extensively discussed the testimony presented and concluded that there had been a material and "disturbing change in circumstances in the home of the mother." The trial court reviewed each of the applicable statutory best interest factors and concluded that Father should be the children's primary residential parent. Mother was ordered to pay Father's attorney's fees. Although the final order did not address the parties' petitions for contempt, a consent order was subsequently entered which dismissed all remaining claims. Mother timely filed a notice of appeal.

## II. ISSUES PRESENTED

On appeal, Mother presents the following issues for review:[3]
1. Whether the trial court erred in finding a material change in circumstances;
2. Whether it is in the children's best interest for Father to be named primary residential parent;
3. Whether the trial court erred in awarding Father attorney's fees.

---

[3] Although Mother only lists these three issues in her brief, she attempts to raise various other issues in the argument section of her brief. We will attempt to address each of these issues where appropriate.

Additionally, Father presents the following issue for review:

4.       Whether Father should be awarded his attorney's fees incurred on appeal.

For the following reasons, we affirm the decision of the chancery court.  In addition, we award Father his attorney's fees on appeal and remand for determination of an appropriate fee.

### III.   DISCUSSION

#### A.       *Standards for Modifying a Custody Order*

A custody decision, once made and implemented, is considered res judicata upon the facts in existence at that time, or those that were reasonably foreseeable when the decision was made. ***Curtis v. Hill***, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006); ***Kellett v. Stuart***, 206 S.W.3d 8, 14 (Tenn. Ct. App. 2006).  Existing custody arrangements are favored because children thrive in stable environments.  ***Kellett***, 206 S.W.3d at 14.  Still, courts are authorized by statute to alter a custody arrangement as required by intervening circumstances, or "as the exigencies of the case may require."  Tenn. Code Ann. § 36-6-101(a)(1) (Supp. 2008).  Tennessee Code Annotated section 36-6-101(a)(2)(B) provides the following instruction regarding changing custody, in pertinent part:

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

Therefore, the "threshold issue" in cases involving a proposed modification of an existing custody order is whether a material change in circumstances has occurred since the initial custody determination. ***Blair v. Badenhope***, 77 S.W.3d 137, 150 (Tenn. 2002).  "Only if the court answers this 'threshold' question in the affirmative does it proceed to perform a new comparative fitness analysis and then determine whether a new custody and visitation arrangement is in the child's best interests." ***Krupp v. Cunningham-Grogan***, No. M2005-01098-COA-R3-CV, 2006 WL 2505037, at *7 (citing *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *McEvoy v. Brewer*, No. M2001-02054-COA-R3-CV, 2003 WL 22794521, at *2 (Tenn. Ct. App. Nov. 25, 2003)).  The party petitioning to change the custody order must prove both that a material change in circumstances has occurred and that a change of custody is in the child's best interest. ***Kellett***, 206 S.W.3d at 14.

"The determinations of whether a material change in circumstances has occurred and where the best interests of the child lie are factual questions." ***In re T.C.D.***, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007) (citing *Turner v. Purvis*, No. M2002-00023-COA-R3-CV, 2003 WL 1826223, at *4 (Tenn. Ct. App. April 9, 2003)).  In child custody cases, we review a trial court's findings of fact de

novo upon the record and presume the findings are correct, unless the preponderance of the evidence is otherwise. ***Hass v. Knighton***, 676 S.W.2d 554, 555 (Tenn. 1984). Unlike this court, trial courts are in a position to observe the witnesses and to assess their credibility. ***Keisling v. Keisling***, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005); ***Buckles v. Riggs***, 106 S.W.3d 668, 676 (Tenn. Ct. App. 2003). Appellate courts are reluctant to second-guess a trial court's custody decision where so much depends on the trial court's assessment of the witnesses' credibility. ***Nelson v. Nelson***, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001); ***Steen v. Steen***, 61 S.W.3d 324, 328 (Tenn. Ct. App. 2001). "Custody decisions often hinge on subtle factors, such as the parents' demeanor and credibility during the proceedings." ***Joiner v. Griffith***, No. M2004- 02601-COA-R3-CV, 2006 WL 2135441, at \*2 (Tenn. Ct. App. July 31, 2006) (citing *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997)). As such, a trial court has broad discretion to fashion a custody and visitation arrangement that best suits the unique circumstances of the case. ***Id.*** at \*2 (citing *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999)). "It is not the function of appellate courts to tweak a visitation order in the hopes of achieving a more reasonable result than the trial court." ***Eldridge v. Eldridge***, 42 S.W.3d 82, 88 (Tenn. 2001). If no error in the trial court's ruling is evident from the record, the ruling must stand. ***Id.*** In sum, a trial court's decision regarding custody should be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." ***Curtis***, 215 S.W.3d at 839 (quoting *Eldridge*, 42 S.W.3d at 88). We will reverse or modify the trial court's custody decision if we conclude that the decision rests on an error of law, if the evidence preponderates against the finding that there has been a material change in circumstances, or if the evidence preponderates against the court's finding as to the children's best interest.

### 1. A Material Change in Circumstances

There are no bright-line rules for determining whether a material change in circumstances has occurred, but some of the many considerations relevant to the issue include: "(1) whether the change occurred after the entry of the order sought to be modified, (2) whether the change was not known or reasonably anticipated when the order was entered, and (3) whether the change is one that affects the child's well-being in a meaningful way." ***Boyer v. Heimermann***, 238 S.W.3d 249, 256 (Tenn. Ct. App. 2007) (citing *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Blair*, 77 S.W.3d at 150). The trial court found that there had been "a disturbing change in circumstances in the home of the mother and her behavior would dictate a change of the custody of the minor children." The chancellor also found that the children's exposure to Mother's instability was "disconcerting, to say the least." **(TR p.73).** Dr. Kennon reported that Mother had demonstrated negative, erratic changes in her behavior since the divorce. We agree with these conclusions. We find that Mother's disturbing and erratic behavior since the divorce constituted a material change in circumstances that affected the well being of the children in a meaningful way.

In Father's motion to modify the parenting plan, he alleged that Mother had engaged in inappropriate behavior and failed to properly care for the children. He specifically referenced, among other things, the August 19, 2006 party at Mother's house, Mother's alleged relationship with

-14-

a teenager, her text messages containing adult subject matter, her recent termination from her job, and the fact that she left Connor at home alone and he called 911. In sum, Father contended that Mother's unusual and irresponsible behavior constituted a material change in circumstances and that it was in the children's best interest that he be designated primary residential parent. On appeal, Mother argues that Father failed to prove a material change in circumstances because she rebutted each of the specific allegations that were listed in Father's petition by testimony or otherwise.

First, Mother points to her testimony in which she denied being terminated from her job, but Mother also claims that her employment situation was irrelevant to the trial court's analysis. The school district's superintendent testified that Mother was forced to resign because of reports that she displayed pornography at school and complaints that high school students were spending too much time at the nurse's station. We conclude that this fact was properly considered by the trial court as an example of Mother's erratic behavior since the divorce.

Although Mother correctly points out that there was no evidence that she "text messaged" inappropriate material to a minor, a sixteen-year-old boy testified that Mother showed him pictures of her breasts on her cell phone and in person. Mrs. Adams testified that Madison brought a cell phone from Mother's home that contained several pictures of someone's bare bottom, and these pictures appear in the record before us. Other adults testified that Mother had shown them pictures on her cell phone of her nude breasts. Although Mother denied each of these allegations, the preponderance of the evidence suggests that Mother had engaged in such inappropriate behavior.

Next, Mother claims that she effectively rebutted the allegation that she had a sexual relationship with a teenager. The trial judge mentioned Mr. Tanner's testimony to the contrary in his findings of fact and conclusions of law, stating:

> Justin Tanner testified that he is 20. He testified that when he was 19 he had sex with [Mother]. He was at the party in question. . . . He stayed all night. He said on that night he began a sexual relationship with [Mother]. He said the dirty dancing was done in front of the children. Their relationship lasted from that night on for about several weeks. He said the children were there sometimes when they had sex. . . . He testified that on the phone [Mother] wanted him to lie for her prior to his deposition.

The trial judge later noted in its findings that Mother denied having a sexual relationship with Mr. Tanner, but the court did not explicitly resolve the conflicting testimony. Even assuming *arguendo* that Mother did not engage in sexual relations with Mr. Tanner, she does not deny that he and other young men were at her home until the early hours of the morning in the presence of her ten-year-old daughter and five-year-old son.

Mother attempts to minimize the significance of the party at her house by insisting that the dancing was not "dirty" and that she did not personally consume alcohol or invite the teenagers to her house. Dr. Kennon found that Mother's "impulsive decision to allow a 'party' at her home with teenagers and younger men under the age of 21 . . . suggests a degree of impulsivity and problematic modeling of appropriate relational boundaries for her children." We similarly find that Mother's

decision to have a party with teenage males, who were closer in age to Madison than to Mother, demonstrated poor judgment and was properly considered by the trial court in assessing Mother's behavior since the divorce.

Next, Mother claims that the trial court erred in allowing testimony regarding facts other than the seven specific allegations in Father's motion to modify the parenting plan. In other words, Mother contends that Father was prohibited from presenting testimony regarding the uncleanliness of her home, her married boyfriend, and her administering unprescribed antibiotics to the children, because Father did not include these allegations in his motion. Mother does not cite any authority for this argument except for "the Rules of Civil Procedure." This Court rejected a similar argument in *Robertson v. Mayes*, No. M2007-02532-COA-R3-JV, 2008 WL 2331030, at *5 (Tenn. Ct. App. W.S. June 3, 2008), as follows:

> Next, Mother argues that her "due process right to have timely and adequate notice [of the allegations against her]" was violated. Father's original petition for custody alleged that he should be granted custody of the children because Mother was using drugs, leaving the children at home alone, failing to change their diapers, and neglecting the children by failing to provide them with a proper diet. Mother argues that Father could not then introduce "evidence of additional allegations not set forth in the petition," such as evidence about her boyfriend's criminal record. . . . In *Keisling v. Keisling*, 92 S.W.3d 374, 380 (Tenn. 2002), the Supreme Court held that a parent's right to due process was violated when the pleadings did not give her notice that *custody* would be an issue in the case, and the trial court changed custody after the hearing. However, that is not the situation here. Mother clearly knew that Father was seeking custody of the children. We find no merit in Mother's argument that she was unaware that the court would consider the situation involving her live-in boyfriend, which is relevant to her fitness as a parent. . . . In fact, one of the statutory factors to be considered in custody determinations is "[t]he character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child." Tenn. Code Ann. § 36-6-106(a)(9). Mother cites no authority for the notion that a trial court can only consider each of the statutory factors if the parent petitioning for custody addressed that factor in his or her petition for custody.

*Id.* at *5. As in *Robertson*, Mother knew that Father was seeking custody of the children based on an alleged material change in circumstances. Father's petition to modify the parenting plan alleged that Mother had "engaged in inappropriate behavior in the presence of the children[,] failed to properly care for the children," and "engaged in unusual and irresponsible behavior." Clearly, facts regarding Mother's relationship with Mr. Reams, her treatment of the children's medical needs, and the cleanliness of Mother's home are relevant to Father's allegations and the best interest of the children. *See* Tenn. Code Ann. § 36-6-106(a)(2), (9) (instructing trial courts to consider a parent's disposition to provide medical care and other necessary care to the child, as well as the character and behavior of any person who frequents the parent's home). This issue is without merit.

Next, Mother contends that "the record is void of any proof" that the changes in Mother's circumstances affected the children. As previously stated, Dr. Kennon found that Mother had demonstrated erratic behavioral changes and stated, "Her admitted involvement with a married man, her impulsive decision to allow a 'party' at her home with teenagers and younger men under the age of 21, in addition to the recent unresolved conflict with her family certainly suggest a degree of impulsivity and problematic modeling of appropriate relational boundaries for her children." In addition, Dr. Kennon noted Mother's unjustified animosity toward Mrs. Adams and found that Mother, "in desperation, [had] attempted to manipulate the children." Dr. Kennon warned that manipulating the children and encouraging them to engage in inappropriate behaviors "can be emotionally abusive" because it draws the children into the center of the parents' conflict. Dr. Kennon found that Mother had told Madison an excessive amount of information regarding the custody case, "including details which were not appropriate to Madison's age and developmental level." He said that children who are overburdened are likely to develop anxiety and depressive symptomatology. We find no merit in Mother's assertion that there was no evidence that her behavior had an effect on the children.

Finally, Mother contends that the doctrine of unclean hands should have prevented Father from seeking relief because "Father was guilty of the very actions of which he accused Mother," such as drinking alcohol, letting the children stay up late, and living with Mrs. Adams before they married. Mother cites one case in support of her unclean hands argument, but it involved a life insurance company's suit to recover on a note. *See Cont'l Bankers Life Ins. Co. of the South, Inc. v. Simmons*, 561 S.W.2d 460, 465 (Tenn. Ct. App. 1977). "[I]n Tennessee, the doctrine of 'unclean hands' does not necessarily repel a petition regarding the welfare of a child because the welfare of the child predominates over any offended dignity of the court." *Bulick v. Thompson*, No. W2004-00816-COA-R3-CV, 2005 WL 123502, at *4 (Tenn. Ct. App. Jan. 18, 2005). Although generally litigants found to have unclean hands will "be repelled at the threshold of the court," *Cont'l Bankers*, 561 S.W.2d at 465, in proceedings where the welfare of a child is concerned, the protection of the child is the focal point. *Bulick*, 2005 WL 123502, at *4. "Biological parents are not required to demonstrate they are perfect before they can be granted custody of their children." *Ray v. Ray*, 83 S.W.3d 726, 734 (Tenn. Ct. App. 2001) (citing *Richard v. Richard*, No. M1999-02797-COA-R3-CV, 2000 WL 679233, at *5 (Tenn. Ct. App. May 25, 2000); *Rice v. Rice*, 983 S.W.2d 680, 682-83 (Tenn. Ct. App. 1998)). Given the nature of these proceedings, the trial court properly rejected Mother's argument based on unclean hands.

## 2. The Children's Best Interest

After finding that a material change in circumstances has occurred, the trial court must then proceed to the second step in the analysis and determine whether the modification sought is in the child's best interest, in light of the factors enumerated in Tennessee Code Annotated section 36-6-106. *In re M.J.H.*, 196 S.W.3d 731, 745 (Tenn. Ct. App. 2005). On appeal, Mother argues that the trial court erred in concluding that it would be in the children's best interest for Father to be primary residential parent. Specifically, Mother claims that the trial court "cherry-picked factors and

suggestions of the expert testimony and report, knew and disregarded the eleven year old's preference, and ruled inconsistently with the best interest analysis."

Mother claims that this case is comparable to ***Burden v. Burden***, 250 S.W.3d 899, 917 (Tenn. Ct. App. 2007), where the Court of Appeals stated that a trial court had "engaged in unjustified judicial 'cherry-picking' of the expert report . . . with no valid evidentiary basis for doing so." In that case, the trial judge stated that he simply did not like the results of the expert's evaluation, and the trial court's final opinion distorted the report's contents to reach the result the judge wanted. *Id.* at 908. Having reviewed Dr. Kennon's entire report and his lengthy testimony, we conclude that it is Mother who has "cherry-picked" Dr. Kennon's report in this case. At oral argument on appeal, Mother's attorney stated that the only instance where Dr. Kennon expressed a concern regarding a negative impact on the children was when he wrote letters expressing his concern that Father was isolating the children from Mother when she had no one to supervise her visitation. However, she fails to note that in those same letters, Dr. Kennon stated that he was "sensitive to [Father]'s concerns regarding the safety of the children," and he recommended that Mother's visitation continue to be supervised. Furthermore, we need not list here Dr. Kennon's many concerns, as stated in his report, repeated in his testimony, and previously discussed in this opinion, regarding Mother's negative and erratic behavior and its effects on the children.

Next, Mother claims that the trial court should have adopted the results of the Bricklin Perceptual Scales test that was administered to Madison and Connor, which found that both children considered Mother to be their parent of choice. Dr. Kennon testified that the test was "a way of looking at [a child's] preference" as to custody, and he said "when this test was being studied, it agreed with the Court's findings 97% of the time." Based on these statements, Mother contends that the trial court abused its discretion in not designating Mother primary residential parent. However, Dr. Kennon did not specifically recommend that Mother or Father be named primary residential parent. Essentially, Mother asks this Court to hold that a trial court must name the child's "parent of choice," as demonstrated by the Bricklin Perceptual Scales, as the primary residential parent. A trial court may reject an expert's testimony if it finds that it is inconsistent with the facts in the case or otherwise unreasonable. ***Burden***, 250 S.W.3d at 915 (citing *Cocke County Bd. of Highway Comm'rs v. Newport Util. Bd.*, 690 S.W.2d 231, 235 (Tenn. 1985)). We see no reason why the results of a single report should be given any more deference. Moreover, we have repeatedly held that a child's preference is only one of many factors to be given consideration in a custody determination, and it is not controlling on the court even when the child is over age twelve. ***In re NRG***, No. E2006-01732-COA-R3-CV, 2007 WL 1159475, at *3 (Tenn. Ct. App. Apr. 19, 2007) (citing *Watson v. Watson*, 196 S.W.3d 695 (Tenn. Ct. App. 2005); *Hoalcraft v. Smithson*, 19 S.W.3d 822 (Tenn. Ct. App. 1999), *Wall v. Wall*, 907 S.W.2d 834 (Tenn. Ct. App. 1998)). This issue is without merit.

Finally, Mother contends that each of the statutory best interest factors weigh in favor of her being named primary residential parent.[4] After reviewing each of the factors, we find that the evidence overwhelmingly supports the trial court's decision to name Father primary residential parent. Although it was undisputed that both parents love the children, Dr. Kennon found that Mother fosters a degree of dependency with Connor so that he had become highly emotionally dependent on her. Mother ignored Dr. Kennon's recommendation to quit sleeping with Connor because she said she had read about co-ed sleeping in a parenting magazine. Mrs. Stafford testified that she had observed a major improvement in Connor's confidence since he went to live with Father. Ms. Tonya Stafford similarly testified that Connor used to be very shy and timid, but he had "opened up" since living with Father and was "a totally different child."

Both parents were able to provide the children with food and clothing, but several witnesses testified about hygienic concerns at Mother's home. The physician's assistant who regularly treated the children testified about concerns she had with Mother providing unprescribed medications to the children. Regarding the children's education, Madison testified that she was currently on the "B Honor Roll," where she had previously been on the "A Honor Roll." However, Mother testified that she intended to transfer the children to a different school if she was granted custody, and Dr. Kennon testified that it would be disruptive if the children were taken out of Bradford. We recognize the importance of continuity in the children's life and their need for a "stable, satisfactory environment," *See* Tenn. Code Ann. § 36-6-106(a)(3), but due to Mother's erratic behavior, she was not providing a stable, satisfactory environment for the children, and again, she intended to move the children away from their community, their school, and their grandparents if she was granted custody. The children

---

[4] The following factors should be considered, where applicable:

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;
(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;
(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; . . .
(4) The stability of the family unit of the parents or caregivers;
(5) The mental and physical health of the parents or caregivers;
(6) The home, school and community record of the child;
(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;
  (B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;
(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; . . .
(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and
(10) Each parent or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a) (Supp. 2008).

had been living with Father for over a year at the time of the final hearing, and Dr. Kennon reported that Father and Mrs. Adams both possessed appropriate parenting skills. Dr. Kennon noted that Father was active in the children's sporting activities and extracurricular activities, while Mother testified that she rarely attended such activities.

Mother again points to the fact that both children demonstrated their preference to live with her through their psychological testing, and Madison testified that she liked living with Mother. Madison was eleven years old at the time of trial, and Connor was seven. The stated preference of a child is one of the statutory factors that can be considered by a trial court when determining what is in the best interest of the child. *Mulkey v. Mulkey*, No. E2004-00590-COA-R3-CV, 2004 WL 2412610, at *5 (Tenn. Ct. App. Oct. 28, 2004). However, the court is not required to consider the preference of a child younger than twelve, and courts are instructed to give "greater weight" to the preferences of older children. Tenn. Code Ann. § 36-6-106(a)(7) (Supp. 2008). "The statute's differentiation based on the age of the child reflects a legislative judgment that the preferences of younger children are less reliable as guides to their best interest." **Costley v. Benjamin**, No. M2004-00375-COA-R3-CV, 2005 WL 1950114, at *16 (Tenn. Ct. App. Aug. 12, 2005). "Children can easily decide they would rather live with the more lenient or generous parent rather than the one who just refused to buy the newest must-have item or who set rules the child did not agree with." *Id.* In this case, the children's preference does not lead us to conclude that it is in their best interest to live with Mother.

Dr. Kennon reported that Mother's manipulation of the children could be emotionally abusive. The only allegation of physical abuse in this case came from the testimony of Mother and Madison, in which they described an incident where Father held Madison upside down and shook her after she got gum in his hair. The trial court apparently did not believe this testimony, as it found "no indication of child abuse on the part of [Father]." Giving due deference to the trial court's assessment of credibility, we find no error in the court's conclusion.

The trial court also found that "the people in the home of [Father] are of good character and behavior." The evidence supports this conclusion as well. As for the parents' ability to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, Dr. Kennon found that Mother had communicated inappropriate and excessive amounts of information to Madison about Mother's conflict with Father. He noted that Mother's manipulative behavior could draw the children into the middle of the conflict. Dr. Kennon also found that Mother's unresolved and unjustified anger toward Mrs. Adams could "obviously promote family disharmony and negatively impact the children's perception." Father acknowledged his difficulty in dealing with Mother, but he testified that he had been attending counseling and he intended to do everything he could to facilitate a good relationship between the children and Mother. Father had allowed the children to maintain a close, continuing relationship with Mother's parents and siblings.

In sum, we find that the weight of the evidence supports the trial court's conclusion that it is in the children's best interest for Father to be named primary residential parent.

### B. Attorney's fees

Mother contends that the trial court erred in awarding $16,214.05 in attorney's fees to Father because he did not show he was unable to pay his attorney's fees. Mother claims that Father should have been ordered to pay her attorney's fees in the amount of $19,447.67. However, she cites no authority for her argument.

Tennessee Code Annotated section 36-5-103 provides, in relevant part:

> (c) The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred . . . in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

The statute vests discretionary authority in the court to award attorney's fees in custody cases. *Shofner v. Shofner*, 181 S.W.3d 703, 719 (Tenn. Ct. App. 2004). The Tennessee Supreme Court has explained that "[i]n cases involving the custody and support of children, . . . it has long been the rule in this State that counsel fees incurred on behalf of minors may be recovered when shown to be reasonable and appropriate." *Taylor v. Fezell*, 158 S.W.3d 352, 360 (Tenn. 2005) (citing *Deas v. Deas*, 774 S.W.2d 167, 169 (Tenn. 1989)). There is no absolute right to such fees, but "their award in custody and support proceedings is familiar and almost commonplace." *Id.* "In awarding attorney's fees pursuant to section 36-5-103(c), the trial court may consider proof of inability to pay, but such consideration will not be controlling." *Id.* (citing *Sherrod v. Wix*, 849 S.W.2d 780, 785 (Tenn. Ct. App. 1992)); *see also Gaddy v. Gaddy*, 861 S.W.2d 236, 241 (Tenn. Ct. App. 1992) (explaining that proof of inability to pay is not a prerequisite to an award of fees under section 36-5-103(c)). "The purpose of these awards is to protect the children's, not the custodial parent's, legal remedies." *Sherrod*, 849 S.W.2d at 785. We review the trial court's decision to award such fees using the less stringent "abuse of discretion" standard of review. *Richardson v. Spanos*, 189 S.W.3d 720, 729 (Tenn. Ct. App. 2005). In this case, we find no abuse of the trial court's discretion in awarding Father his attorney's fees.

Father has requested an award of his attorney's fees on appeal. "The determination of whether to award attorney's fees for an appeal is within our discretion." *Harris v. Harris*, 83 S.W.3d 137, 141 (Tenn. Ct. App. 2001) (citing Tenn. Code Ann. § 36-5-103). In determining whether an award for attorney's fees is warranted, we should consider, among other factors, the ability of the requesting party to pay his or her own attorney's fees, the requesting party's success on appeal, and whether the requesting party has been acting in good faith. *Shofner*, 181 S.W.3d at 719. Considering Father's success on every issue on appeal, the weakness of Mother's arguments on appeal, and the good faith demonstrated by Father throughout these proceedings, we hold that his

request for attorney's fees is proper and remand the cause to the trial court to set a reasonable fee for the services rendered by counsel on appeal.

## IV.  CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court and remand for further proceedings.  Costs of this appeal are taxed to the appellant, Tammy Renee Adams, and her surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.